UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MIAMI VALLEY FAIR
HOUSING CENTER INC., *et al.*,

    Plaintiffs,

v.

METRO DEVELOPMENT LLC, *et al.*,

    Defendants.

Case No. 2:16-cv-607
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 67), Plaintiff's Memorandum in Opposition (ECF No. 72), and Defendant's Reply in Support. (ECF No. 87.) For the reasons that follow, Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

This action arises out of alleged violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601 *et seq*. Plaintiffs allege that Defendants violated and continue to violate the accessibility requirements of the FHAA, thereby discriminating against individuals with disabilities. (Am. Compl. ¶¶ 1–2, ECF No. 48.) Plaintiffs base the discrimination allegations on multifamily dwellings located in and around Columbus including, Northpark Place, Albany Landings, Four Pointe, Remington Woods, Residences at Central Park, the Woods at Perry Lane, and Winchester Park, claiming those dwellings were not designed or constructed in conformity with the FHAA. (*Id.*)

## A. MVFHC

Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a non-profit organization that aims to eliminate housing discrimination through education and outreach to housing consumers and providers, counseling to individuals subjected to unlawful discrimination, and enforcement of the fair housing laws against housing providers who transgress the law. (*See* Zimmerman Dep. at 178–79.) MVHC is run by its President and CEO Jim McCarthy, Vice President and head of education and outreach John Zimmerman, and Director of Investigations and Enforcement Anita Schmaltz.

The majority of MVFHC's funding comes from the United States Department of Housing and Urban Development ("HUD") grants. Pursuant to these grant, MVFHC employees must spend a specific amount of time investigating potential FHAA violations.

## B. COFHA

MVFHC created the Central Ohio Fair Housing Association ("COFHA"), to expand its presence in central Ohio. (McCarthy Dep. at 133:9–17.) Located in Columbus, COFHA shares the same ultimate goal as MVFHC of combatting housing discrimination. MVFHC formed COFHA to serve as a separate organization with a physical presence in Columbus. Although MVFHC formed COFHA as a distinct legal entity, MVFHC desired to retain control of COFHA in light of the considerable time, effort, and money MVFHC spent creating the organization. (McCarthy Dep. 77:14–17 ("Because we [MVFHC] were putting a significant amount of resources, cash and personnel time into creating the organization and we wanted to retain control of the corporation."), ECF No. 67-14.)

The organizations share many of the same board members and executives. For example, MVFHC's President and CEO, Mr. McCarthy, also serves as President and CEO of COFHA.

2

(McCarthy Dep. 16:20–21.) While COFHA asserts that it keeps its own accounting of its work separate from the work of MVFHC and applies for and is awarded grants separately from MVFHC, MVFHC provides the W-2, paychecks, and any reimbursements to Thomas Curnutte, COFHA's only claimed employee not already employed by MVFHC. (Curnutte Dep. at 18:13–24; 37:4–11.)

**C. Investigation**

As part of her role as the Director of Investigations and Enforcement, Ms. Schmaltz monitors the construction of new multifamily housing throughout Ohio to review compliance with the Fair Housing Act's accessibility requirements. (Schmaltz Dep. 71:10–72:7.) Ms. Schmaltz received training for her position as investigator through the National Fair Housing Alliance. (Schmaltz Dep. 51:8–10.) She has attended various training seminars including "fair housing school" which consisted of a week's worth of training on intakes and investigations. (Schmaltz Dep. 51:18–24; 52:1–9.)

After reviewing a list of recently constructed rental properties in Columbus, Ms. Schmaltz determined that Ardent Property Management ("Ardent") was a prolific builder of multifamily rental housing. She thereafter chose to investigate Ardent properties, choosing to focus on "who is having the greatest impact on the area to make sure that they are building in compliance with the Fair Housing Act." (Schmaltz Dep. 72:4–6, ECF No. 72-9.)

Ms. Schmaltz began her investigation with all publicly available information including floorplans for various unit types. Her assessment of the floor plan of one Ardent property, Northpark Place, raised concerns that the unit would be difficult to maneuver for an individual using a wheelchair. She therefore decided to conduct an in-person inspection of the property. (Schmaltz Dep. 214:11–20.) Her audit included measuring various components of a first-floor

apartment unit and common areas as well as inspecting exterior features of the property. Ms. Schmaltz noted what she believed to be insufficient clear floor space in the bathrooms for a wheelchair bound individual, insufficient space between the refrigerator and opposing countertop to allow for a wheelchair to maneuver, and inaccessible routes from parking areas to building entrances. (Schmaltz Dep. 145:18–23; 329:10–22.) Ms. Schmaltz then visited other Ardent properties including Remington Woods and directed the investigation of six other multifamily properties. (Schmaltz Dep. 230:1–5.) There, the investigation found what she deemed inaccessible features on the exterior of the property, including inaccessible routes, an absence of parking spaces with room for a person in a wheelchair to exit, and curb stops blocking the sidewalks.

**D. Education**

MVFHC asserts that it has undertaken additional efforts to educate the communities they service as a result of the alleged violations they have found, including non-compliance in the kitchens and bathrooms of Defendants' properties. MVFHC submitted meeting minutes which discuss the planning of a seminar. The meeting minutes state:

> In response to non-compliance with the accessibility design & construction requirements of the federal Fair Housing Act that has been revealed by our investigations to date, staff has been working to bring a seminar on Fair Housing Accessibility to Columbus and secure co-sponsors for the event. The presentation is designed for architects, developers, builders, private fair housing organizations, and other interested parties. The seminar will cover the seven basic requirements of the Fair Housing Act, as well as strategies for compliant bathrooms and kitchens . . . the costs to conduct the all-day seminar will be approximately $5,000
> . . .

(Exhibit 49 at PL 010291, ECF No. 72-9.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4

56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. DISCUSSION

Defendants move for judgment on Plaintiffs' claims, asserting that Plaintiffs lack standing. Article III § 2 of the United States Constitution limits federal jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. Standing "is an essential and unchanging part of"

the case or controversy requirement. *Miami Valley Fair Hous. Ctr., Inc. v. Preferred Real Estate Invs., LLC*, Case No. 2:15-cv-2737, 2017 U.S. Dist. LEXIS 33076, at *9 (S.D. Ohio March 8, 2017) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992)). Federal courts must not go "beyond the bounds of authorized judicial action and thus offend[] fundamental principles of separation of powers." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). If the plaintiff lacks standing, the federal court lacks jurisdiction. As such, standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To demonstrate standing under Article III, a plaintiff must show first that it "suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). The injury must also be "fairly traceable to the challenged action of the defendant." *Id.* Finally, it must be "likely" that the injury will be "redressed by a favorable decision." *Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews*, 210 F. App'x 469, 471 (6th Cir. 2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Raines v. Byrd*, 521 U.S. 811, 818–19 (1997). The party invoking federal jurisdiction bears the burden of demonstrating Article III standing. *Preferred Real Estate Invs.*, 2017 U.S. Dist. LEXIS 33076, at *10.

In the instant matter, Plaintiffs seek to invoke organizational standing on their own behalf, showing injury based on a diversion of resources and frustration of mission. An organization may assert standing on its own behalf if it can demonstrate the defendant's conduct caused a "concrete and demonstrable injury to the organizations activities," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), "not a mere 'setback' to its 'abstract social interests.'" *Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). This Court

recently explained, "[in] the wake of *Havens*, the Sixth Circuit has recognized . . . [that] 'an organization meets Article III standing requirements where it can show that the defendant's alleged violations of the Fair Housing Act caused it to divert resources from other projects or devote additional resources to a particular project in order to combat the alleged discrimination.'" *Preferred Real Estate Invs.*, 2017 U.S. Dist. LEXIS 33076, at *11–12. The Sixth Circuit requires organizational plaintiffs to demonstrate an injury that is independent of litigation costs. *Vill. of Olde St. Andrews*, 210 F. App'x at 475 (citing *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993)). This requirement allows costs related to prelitigation investigation to form the basis for standing. *Id.*

In *Havens*, the Supreme Court found organizational standing under the Fair Housing Act where a housing organization sent testers to a housing complex and confirmed the existence of racial steering. *Havens Realty Corp.*, 455 U.S. at 368. The Court found a concrete and demonstrable injury. There, the organization asserted and the Court agreed that it "has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices" and as a result the discriminatory conduct impaired the organization's ability to provide services due to "the consequent drain on the organization's resources[.]" *Id.* at 379.

Courts find expenditures based on the investigation of properties, including the deployment of employees to investigate the at-issue property, sufficiently independent of litigation costs to confer standing. For example, in *Vill. of Olde St. Andrews*, of its own volition, the organization sent testers to defendant's property and identified several FHAA violations. The Sixth Circuit accorded organizational standing based on expenditures related to the deployment of the testers finding the costs incurred constituted a concrete injury. *Id.* at 476–77.

7

Similar investigations have also been found to confer standing. *See Hughes v. Peshina*, 96 F. App'x 272, 274 (6th Cir. 2004) (pre-litigation investigation consisting of single test sufficient for organization's standing); *Hooker*, 990 F.2d at 915 (plaintiff "devoted resources to investigating the defendants' practices" and therefore had standing); *Hous. Opportunities Made Equal, Inc.*, 943 F.2d at 646 (holding that plaintiff's expenditure of resources investigating discrimination was "sufficient to confer standing").

The case law all follows the decision in *Hooker*, where a housing organization sent a tester to a trailer park to investigate allegations that the manager refused to rent or sell trailers to young people or families with children. 990 F.2d at 914. Based on the investigation, the housing organization filed suit against the manager of the trailer park. *Id.* The district court dismissed the suit for lack of standing. *Id.* at 915. The Sixth Circuit reversed, holding that sending a tester to investigate the claim sufficiently constituted a use of resources as to confer standing. *Id.*

**A. MVFHC Standing**

Plaintiffs assert MVFHC diverted resources to investigate the properties and on education to inform the public about the alleged discriminatory practices. Defendants counter that any resources MVFHC diverted were in conjunction with and not independent of the instant litigation. Defendants contend that litigation was a foregone conclusion at the outset of the investigation.[1] To support this argument, Defendants look to MVFHC's time-entries, where the first entry attributable to the instant matter took place on February 10, 2016, the same day MVFHC gave its authorization to file suit against Ardent. (Mot. to Dismiss at 18, ECF No. 67.) MVFHC, however, has set forth sufficient evidence that it did investigate the properties prior to

---

[1] Defendants also argue that Plaintiffs' exhibits 1–49 are inadmissible as improperly authenticated. (Reply in Support at 3, ECF No. 87.) As the Court relies on admissible deposition testimony, this issue need not be addressed at this time.

8

filing suit, including testimony from Ms. Schmaltz about her various on-site inspections as well as, the testimony of Miranda Wilson about the investigations. (Exhibit 25 at PL 008281, 008283 008284, 008287–88, ECF No. 72-5; Exhibit 26 at 008421, ECF No. 72-5; Schmaltz Dep. 72:4–6, 145:18–23; 214:11–20; 230:1–5; 329:10–22; Wilson Dep. 48:20–24; 49:1–24.)

Furthermore, MVFHC asserts that it has undertaken additional efforts to educate the communities they service as a result of the alleged violations they have found. This includes the organization of a seminar during which there will be a presentation that covers "the seven basic [accessibility] requirements of the Fair Housing Act, as well as strategies for compliant bathrooms and kitchens." (Exhibit 49 at PL 010291, ECF No. 72-9.) As MVFHC specifically asserts the Defendants' properties violate the FHAA in the bathrooms and kitchens, this new seminar appears sufficiently driven by the alleged violations.

Defendants further assert MVFHC did not divert resources because, under the HUD grant, MVFHC was required to investigate properties as it did here. The Court disagrees. The Sixth Circuit has held that standing is not negated even where the organization has a grant for the purpose of investigating housing discrimination. *Vill. Of Olde St. Andrews*, 210 F. App'x at 477 (finding HUD grant funding requiring investigation "does not mean that the use of a portion of those funds to investigation [] properties does not amount to a concrete injury."). Although MVFHC's grant is tied to investigating properties such as Defendants', Plaintiffs have sufficiently diverted resources for standing to be appropriate.

Finally, Defendants contend that because MVFHC's mission statement limits the organization's geographic service area to the Miami Valley region, which does not include Columbus or Franklin County, MVFHC lacks standing as Defendant properties are outside MVFHC's geographic area and thus could not cause injury. This Court previously dismissed

this assertion in *Preferred Real Estate Invs.*, where it held that *Havens* and *Hooker* "do not explicitly require the injury to be tied to a geographic region" and thus found "no reason to impose strict geographic limits on a housing organization." 2017 LEXIS 33076, at *21. The Undersigned agrees and similarly declines to limit MVFHC's reach to the Miami Valley. Thus, Defendants' Motion to Dismiss MVFHC for lack of standing is **DENIED**.

**B. COFHA Standing**

Defendants also move to dismiss COFHA, arguing that it lacks standing. The Court agrees. COFHA argues that it has standing in the instant action asserting that it diverted resources by devoting staff time to the investigation of Defendants' properties and because it increased its education and outreach efforts to redress the harm Defendants cause to its mission. COFHA only purports to have one full-time staff member, Thomas Curnutte, while all other staff also work for MVFHC. Defendants dispute whether the Mr. Curnutte is a COFHA employee or also works for MVFHC. As in *Preferred Real Estate Invs.*, there is undisputed record evidence that Mr. Curnutte is paid by MVFHC and that COFHA has never issued a W-2. (McCarthy Dep. 50:14–16.)

Furthermore, Mr. McCarthy the CEO of both MVFHC and COFHA testified that COFHA does not have any employees. (McCarthy Dep. 50:11–19 (Q. "Just to be clear, CO[F]HA doesn't have any of its own employees, correct?" A. "'that's fair, I guess").) Mr. McCarthy also testified that COFHA cannot perform enforcement work, such as investigations. (McCarthy Dep. at 113:4–24; Davis-Williams Dep. at 101:16–24; 102:1–3 ("we [COFHA] cannot do enforcement . . .").)

COFHA also asserts that it has diverted resources because some MVFHC employees acted on COFHA's behalf as well as MVFHC's. The record reflects, however, that those

10

individuals are employees of MVFHC not COFHA as they are paid by MVFHC and receive their W-2s from MVFHC not COFHA. This Court has found standing for MVFHC based on its diversion of resources. At most, Plaintiffs' argument that COFHA has diverted resources because the MVFHC employees have also billed time under COFHA contributes to MVFHC's diversion of employee time, not COFHA's. To argue otherwise undermines MCFHC's basis for standing. As a result, COFHA is essentially an extension of MVFHC. Moreover, COFHA claims it expended resources by increasing its education and outreach but does not, similar to *Preferred Real Estate Invs.*, put forth evidence that reflects any increase in education is driven by Defendants' properties. 2017 LEXIS 33076, at *23 ("There is also no evidence in the record to suggest that COFHA *increased* its education and outreach efforts *in response* to Defendants' actions.") (alteration in original).

Finally, COFHA claims that it has standing because its mission has been frustrated. Standing, however, cannot be based on a "mere setback" to an organization's "abstract social interests." *Equal Rights Center*, 633 F.3d at 1138. Without more, COFHA's allegations that Defendants' properties are in violation of FHAA are insufficient to confer standing. Thus, Defendants' Motion to Dismiss COFHA for lack of standing is **GRANTED**.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

3-7-2018
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

11